J-A06009-26                    2026 PA Super 174

| | | |
|---|---|---|
| EUGENE HAMMELL., M.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ALLEGHENY CLINIC | : | |
| | : | |
| Appellant | : | No. 611 WDA 2025 |

Appeal from the Judgment Entered April 17, 2025
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  GD-20-001273

BEFORE:  OLSON, J., MURRAY, J., and BECK, J.

OPINION BY OLSON, J.:                    **FILED:  August 4, 2026**

Appellant, Allegheny Clinic ("Appellant Allegheny Clinic"), appeals from the judgment entered on April 17, 2025, in favor of Plaintiff Eugene Hammell, M.D. ("Dr. Hammell") and against Appellant Allegheny Clinic, in the amount of $266,402.68.  We vacate and remand.

Dr. Hammell instituted the current action against Appellant Allegheny Clinic in 2020.  Within his complaint, Dr. Hammell averred that he "is a medical doctor licensed in the Commonwealth of Pennsylvania with Board Certification in General Surgery.  He has practiced general surgery in the Commonwealth since" 1989.  Dr. Hammell's Complaint, 2/18/20, at ¶ 2.  Appellant Allegheny Clinic is "a group medical practice that employs physicians to provide medical care to patients at hospitals and medical facilities owned by, or affiliated with" Allegheny Health Network ("AHN").  *Id.* at ¶ 4-5.

According to the complaint, in 2010, Dr. Hammell became Medical Director of Ambulatory Services at Canonsburg Hospital. In 2013, Canonsburg Hospital "became a part of AHN." *Id.* at ¶ 11. Also in 2013, "an AHN subsidiary, Landing Zone, P.C. [("Landing Zone")], purchased [Dr. Hammell's] private surgical practice and entered into a Physician Employment Agreement ("Base Employment Agreement") with [Dr. Hammell, whereby Dr. Hammell] was hired to provide general surgical services at [Canonsburg] Hospital." *Id.* at ¶ 12. As the trial court explained:

> [Dr. Hammell's Employment Agreement with Landing Zone] dated May 30, 2013 provided Dr. Hammell a base annual salary of $310,000, subject to a "Productivity Adjustment." Dr. Hammell was required to generate 6,875 work Relative Value Units ("wRVUs") per year. For any year he generated less than 95 percent of 6,875 wRVUs, his salary the next year would be reduced by the percent by which his wRVUs had fallen short of 6,875 the previous year. WRVUs are described in the [Employment Agreement] as a measurement developed by the Centers for Medicare and Medicaid Services.[1] WRVUs also are described as the measure of a physician's output from a patient billing standpoint with an

---

[1] Specifically, the Employment Agreement declares:

> The wRVUs . . . that will be included in the productivity requirement shall be such wRVUs as are developed by the Centers for Medicare and Medicaid Services (CMS) for all services identified by Current Procedural Terminology (CPT) Codes pursuant to the then-current CPT publication of the American Medical Association for the applicable contract year in question, which are personally performed by [Dr. Hammell] and billed on behalf of [Dr. Hammell].

Base Employment Agreement, 5/30/13, at 18.

office visit valued at one or two wRVUs and a gallbladder removal surgery at [12 or 16] wRVUs.

During the first two years, Dr. Hammell had at least 95 percent of 6,875 wRVUs. In the third year, Dr. Hammell found out in February [2016] that his projected wRVUs for that contract year could result in an approximately $40,000 base salary reduction the next year. However, he and [Landing Zone] renegotiated his [Employment Agreement] to reduce his wRVUs[; the renegotiated contract further provided that Dr. Hammell was required to "generate wRVUs greater than or equal to the wRVU Target," or Dr. Hammell's salary would be reduced by a certain percentage. *See* Amended Employment Agreement, 6/2/16, at 2.[2]] . . .

For the June 3, 2017 [through] June 2, 2018 contract year, Dr. Hammell was 18.55 percent below his agreed upon wRVUs. The Contracting Committee of [Appellant Allegheny Clinic] customarily exercised discretion to not reduce salaries based on wRVU shortages if the Vice President of the applicable line of physicians advocated against a reduction. For the 2017-2018 contract year 18.55 percent wRVU miss by Dr. Hammell, the surgical Vice President advocated against a reduction in Dr. Hammell's base salary. The Contracting Committee of [Appellant Allegheny Clinic] then exercised its discretion to not reduce his base salary.

Dr. Hammell split being "on call" for surgery at Canonsburg Hospital with Dr. Steve Gerwel, a private practitioner who was not an employee of [Landing Zone or Appellant Allegheny Clinic.[3]] Dr. Hammell received a $40,000 salary for splitting

_____

[2] In this opinion, we will refer to the Base Employment Agreement of May 30, 2013 and the Amended Employment Agreement of June 2, 2016, collectively, as the "Employment Agreement."

[3] Dr. Hammell testified:

Surgical call is essentially for the most part un-referred call from an emergency department. In other words, if somebody comes in and requires a surgical evaluation, you would get the call whether it's nine in the morning or three in the evening – or three

*(Footnote Continued Next Page)*

Canonsburg Hospital call coverage services with Dr. Gerwel. At the end of December [2018,] Dr. Gerwel telephoned Dr. Hammell and said he was retiring that day at midnight. Dr. Hammell thereafter began providing 100 percent of the surgical call services to Canonsburg Hospital, was on call for 70 of 78 days and at one point was on call for 37 consecutive days. He was contacting his [supervisors at Appellant Allegheny Clinic] repeatedly during this period to get additional surgeons to help him cover surgical call at Canonsburg Hospital. One of his supervisors, Dr. Ngoc Thai, reached out to some [] physicians at [] Jefferson Hospital to assist Dr. Hammell by taking some of the surgical call at Canonsburg Hospital. Jefferson Hospital, Canonsburg Hospital and [Appellant Allegheny Clinic] are under the umbrella of the [AHN] organization.

Dr. Hammell, on March 18, 2019[,] sent an email to Dr. Ngoc Thai, the [surgical Vice President at Appellant Allegheny Clinic,] and two Canonsburg Hospital officials[,] informing them that his extraordinary amount of surgical call raised patient safety concerns. Dr. Thai, who previously referred to Dr. Hammell as an "a-hole" in an email, said he was so angry about Dr. Hammell's March 18 email that he couldn't speak to Dr. Hammell about it. Dr. Thai also said he wanted to fire Dr. Hammell. After another email by Dr. Hammell on March 25, 2019 that copied Dr. Thai, Dr. Thai telephoned Dr. Hammell and was angry. Dr. Thai yelled that Canonsburg is a small hospital, Dr. Hammell is a "P" word for trying to reduce his on call time and is not a team player.

Dr. Thai next set up an in-person meeting with Dr. Hammell at Dr. Hammell's office on April 16, 2019. That meeting was brief[,] with Dr. Thai saying Dr. Hammell has "one foot out the door," he was unhappy about Dr. Hammell's March emails[,] and Dr. Hammell's salary was going to be lowered

_____

in the morning. . . . [My obligations for being on call] were I was easily reachable by phone, avoided drinking any alcohol except when I was on vacation, and was able easily to get to the hospital within a half hour.

N.T. Trial, 1/25/24, at 29-30.

- 4 -

because of Dr. Hammell's wRVUs. Since January 1[, 2019, when] Dr. Hammell had become responsible for most of [Canonsburg Hospital's] surgical on call, the commitment of being on call resulted in no additional wRVUs for him unless he actually performed surgeries. After June 2, 2019, when Dr. Hammell's contract year expired, [Appellant Allegheny Clinic] determined he had failed to meet his wRVU quota and implemented an annual salary reduction of $112,000 that began in the fall of 2019. When Dr. Hammell's contract term expired on June 2, 2021, he left Canonsburg Hospital and [Appellant Allegheny Clinic] and began employment as the Medical Director for an insurance company.

Trial Court Opinion, 8/20/25, at 2-6 (citations omitted).

Dr. Hammell's complaint against Appellant Allegheny Clinic contained six counts, two of which are relevant to the current appeal: Count IV, claiming that Appellant Allegheny Clinic violated Pennsylvania's Wage Payment and Collection Law ("WPCL"), 43 P.S. §§ 260.1-260.45, and Count VI, claiming that Appellant Allegheny Clinic breached the Employment Agreement, which caused his failure to meet his wRVU quota. **See** Dr. Hammell's Complaint, 2/18/20, at ¶¶ 46-88. The two claims are interdependent: Dr. Hammel's WPCL claim permitted him to seek statutory damages for salary reductions resulting from Appellant Allegheny Clinic's alleged breach of the Employment Agreement which, in turn, caused the doctor to miss his wRVU quota.

The case proceeded to a bench trial, where the trial court found in favor of Dr. Hammell and against Appellant Allegheny Clinic on Counts IV and VI "in the amount of $148,018.83 for breach of contract/salary, plus interest, plus liquidated damages of $37,004.71 under the [WPCL]." Trial Court Decision, 4/3/24, at 1.

- 5 -

Appellant Allegheny Clinic filed a timely post-trial motion,[4] which was denied on May 10, 2024. Judgment was entered on the trial court's decision on April 17, 2025 and Appellant Allegheny Clinic filed a timely notice of appeal. After Appellant Allegheny Clinic filed its concise statement, the trial court filed its opinion and explained the reasoning behind its decision. Specifically, the trial court explained, it decided in favor of Dr. Hammell and against Appellant Allegheny Clinic on the breach of contract and WPCL claims because: 1) Appellant Allegheny Clinic breached its express obligation under the Employment Agreement to provide Dr. Hammell with "personnel, facilities, equipment, services, and supplies," when Appellant Allegheny Clinic failed to act on Dr. Hammell's "suggest[ion] of increasing [his] wRVUs by creating a wound care or hernia center at" the hospital; 2) Appellant Allegheny Clinic breached its express obligation under the Employment Agreement to provide Dr. Hammell with "personnel, facilities, equipment, services, and supplies," "when [AHN's Chief Medical Officer], Dr. Thomas Corkery, talked to [Appellant] Allegheny Clinic about building up referring Primary Care Physicians and surgical specialists at Canonsburg Hospital;" 3) Appellant Allegheny Clinic breached its implied duty under the Employment Agreement

---

[4] The trial court's decision was dated April 3, 2024. The docket, however, reflects that written notice of the entry of the decision was not given until May 3, 2024. **See** Docket Entry, 4/3/24, at 1. Thus, Appellant Allegheny Clinic's post-trial motion, which was filed on April 15, 2024, was timely. **See** Pa.R.C.P. 236(b); **Carr v. Michuck**, 234 A.3d 797, 806 (Pa. Super. 2020) (holding: a post-trial motion is timely if it is filed "within ten days of the date on which Rule 236 notice is noted on the trial court docket").

to provide Dr. Hammell with a sufficient number of patients so that Dr. Hammell could meet his wRVU quota; 4) Appellant Allegheny Clinic failed to "exercise[] good faith and fair dealing in the performance of the [Employment Agreement] with Dr. Hammell," by thwarting Dr. Hammell's "attempt[] to increase his patient base by meeting with its Physician Liaison Group," failing to act on his "idea[] of a wound care or a hernia center at Canonsburg to attract additional patients," and unreasonably exercising its discretion to not advocate for Dr. Hammell and to reduce his salary; and, 5) Dr. Hammell was entitled to damages under the WPCL because Appellant Allegheny Clinic breached its duty to assist Dr. Hammell and "Dr. Hammell earned [his] base salary wages." *See* Trial Court Opinion, 8/20/25, at 1-19.

On appeal, Appellant Allegheny Clinic raises the following two issues:

1. Whether [Appellant] Allegheny Clinic was entitled to judgment notwithstanding the verdict because the trial court incorrectly imputed terms into the fully integrated, unambiguous [Employment] Agreement between Dr. Hammell and [Appellant] Allegheny Clinic to find that a breach of contract had occurred[?]

2. Whether [Appellant] Allegheny Clinic was entitled to judgment notwithstanding the verdict because the trial court erroneously held that a violation occurred under the Pennsylvania [WPCL] even though no breach of contract occurred, [Appellant] Allegheny Clinic acted in good faith, and Dr. Hammell received all compensation he was owed[?]

Appellant Allegheny Clinic's Brief at 4.

First, Appellant Allegheny Clinic claims that the trial court erred when it decided in favor of Dr. Hammell and against Appellant Allegheny Clinic on the breach of contract claim.

We have explained:

> This Court, on appeal from a non-jury [decision], is to determine whether the trial court's findings are supported by the evidence and whether the trial court erred in applying the law. The evidence is considered in the light most favorable to the verdict winner, and the trial court's findings are given the same weight and effect on appeal as jury verdicts. Credibility determinations and consideration of conflicts in the evidence are within the purview of the trial court and such evidence should not be reweighed on appeal. We do not disturb findings of fact simply because this Court would have reached a different conclusion, but rather determine whether there is competent evidence in the record that a judicial mind could reasonably have determined to support the finding.

*John B. Conomos, Inc. v. Sun Co., Inc.*, 831 A.2d 696, 703 (Pa. Super. 2003) (citations omitted).

"Three elements are necessary to plead properly a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Discover Bank v. Booker*, 259 A.3d 493, 495 (Pa. Super. 2021) (quotation marks and citations omitted). "A party claiming breach must establish its elements by a preponderance of the evidence." *Id.* at 496. As the Pennsylvania Supreme Court declared:

> When a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there

is no need to resort to extrinsic aids or evidence. Hence, where language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended.

The meaning of an unambiguous contract presents a question of law for which our review is *de novo*.

The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself. In determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect. [A court] will not interpret one provision of a contract in a manner which results in another portion being annulled.

*Lesko v. Frankford Hosp.-Bucks County*, 15 A.3d 337, 342 (Pa. 2011) (quotation marks, citations, footnotes, and corrections omitted).

The Employment Agreement declares that Dr. Hammell's base salary was $380,000.00 and that, each year, he was required to obtain a certain productivity target, measured in wRVUs. **See** Amended Employment Agreement, 6/2/16, at 1. The agreement further provides that, if Dr. Hammell failed to reach the specified wRVU target, Dr. Hammell's base salary for the following year would be reduced by a certain percentage. **See** Base Employment Agreement, 5/30/13, at 18; **see also** Amended Employment Agreement, 6/2/16, at 2.

The Employment Agreement also specified the duties of Appellant Allegheny Clinic to Dr. Hammell. As is relevant to the current appeal, the agreement declares:

Employer Responsibilities.

(a) Practice Support. [Appellant Allegheny Clinic] shall provide [Dr. Hammell] with such personnel, facilities, equipment, services, and supplies as are required by [Dr. Hammell's] practice and other duties under this Agreement consistent with general industry standards. [Appellant Allegheny Clinic] shall seek the input of [Dr. Hammell] on issues related to office personnel and staffing; provided, however, that all such decisions shall remain subject to the sole and absolute discretion of [Appellant Allegheny Clinic]. Notwithstanding the foregoing, [Appellant Allegheny Clinic] shall undertake commercially reasonable efforts to ensure that [Dr. Hammell's] practice is adequately staffed to answer telephone calls, schedule patient appointments, greet and escort patients to exam rooms, review with patients their completed medical history sheet, obtain and record patient vital signs, enter patient histories into their visit notes, ensure any prior history is entered into patient charts, communicate patient instructions to front office staff, facilitate prescribed course of treatment, assist with information technology issues and assist [Dr. Hammell] with in-office medical procedures.

Base Employment Agreement, 5/30/13, at 18.

Finally, the Employment Agreement contains an integration clause, declaring: "[t]his Agreement contains the entire understanding between the parties hereto and supersedes any prior agreement, oral or written, between [Appellant Allegheny Clinic] and [Dr. Hammell]."[5, 6] *Id.* at 13.

---

[5] As to amending the Employment Agreement, the agreement provides: "[t]his Agreement may not be modified or amended except by an instrument in writing signed by the parties hereto." Base Employment Agreement, 5/30/13, at 14.

[6] We note that the Employment Agreement contains a non-waiver clause, declaring:

*(Footnote Continued Next Page)*

- 10 -

The parties and the trial court agree that the Employment Agreement is "silent as to which party was responsible for bringing in new patients and referral sources." *See* Dr. Hammell's Brief at 10. Nevertheless, the trial court relied upon the doctrine of necessary implication and the duty of good faith and fair dealing to conclude that Appellant Allegheny Clinic breached its implied duty under the Employment Agreement to provide Dr. Hammell with a sufficient number of patients so that Dr. Hammell could meet his wRVU quota. *See* Trial Court Opinion, 8/20/25, at 9-15. The trial court further concluded that Appellant Allegheny Clinic breached its express obligation under the Employment Agreement to provide Dr. Hammell with "personnel, facilities, equipment, services, and supplies," when Appellant Allegheny Clinic: failed to act on Dr. Hammell's "suggest[ion] of increasing [his] wRVUs by creating a wound care or hernia center at" the hospital and 2) failed to act "when [AHN's Chief Medical Officer], Dr. Thomas Corkery, talked to [Appellant] Allegheny Clinic about building up referring Primary Care Physicians and surgical specialists at Canonsburg Hospital." *See id.* at 7-8.

---

No term or condition of this Agreement shall be deemed to have been waived, and there shall not be any estoppel against the enforcement of any provision of this Agreement, except by written instrument of the party charged with such waiver or estoppel. No such written waiver shall be deemed a continuing waiver unless specifically stated therein, and each such waiver shall operate only as to the specific term or condition waived and shall not constitute a waiver of such term or condition for the future or as to any act other than that specifically waived.

Base Employment Agreement, 5/30/13, at 14.

Now on appeal, Appellant Allegheny Clinic claims that the trial court erred in concluding it breached any duty under the Employment Agreement, as Appellant Allegheny Clinic was only "required to provide personnel, facilities, equipment, services and supplies as are required by [Dr. Hammell's] practice – not business and patient referrals." Appellant Allegheny Clinic's Brief at 16 (emphasis omitted). We agree.

We have held:

> We will reverse a trial court's grant or denial of a [JNOV] only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.
>
> There are two bases upon which a [JNOV] can be entered; one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nonetheless requires a verdict in his favor. Whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.
>
> The proper standard of review for an appellate court when examining the lower court's refusal to grant a [JNOV] is whether, when reading the record in the light most favorable to the verdict winner and granting that party every favorable inference therefrom, there was sufficient competent evidence to sustain the verdict. Questions of credibility and conflicts in the evidence are for the trial court to resolve and the reviewing court should not reweigh the evidence.

*Greco v. Myers Coach Lines, Inc.*, 199 A.3d 426, 430 (Pa. Super. 2018) (quotation marks and citations omitted).

The Employment Agreement in the case at bar contains an integration clause, declaring that the "Agreement contains the entire understanding between the parties hereto and supersedes any prior agreement, oral or written, between [Appellant Allegheny Clinic] and [Dr. Hammell]." ***See*** Base Employment Agreement, 5/30/13, at 13. As our Supreme Court has held:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.
>
> Therefore, for the parol evidence rule to apply, there must be a writing that represents the entire contract between the parties. To determine whether or not a writing is the parties' entire contract, the writing must be looked at and if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the parties' engagement, it is conclusively presumed that the writing represents the whole engagement of the parties. An integration clause which states that a writing is meant to represent the parties' entire agreement is also a clear sign that the writing is meant to be just that and thereby expresses all of the parties' negotiations, conversations, and agreements made prior to its execution.
>
> Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract. One exception to this general rule is that parol evidence may be introduced to vary a writing meant to be the parties' entire

contract where a party avers that a term was omitted from the contract because of fraud, accident, or mistake. In addition, where a term in the parties' contract is ambiguous, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 497-498 (Pa. 2004) (quotation marks, citations, corrections, and footnotes omitted). "Furthermore, notwithstanding the name given to it, the parol evidence rule is a rule not of evidence but of substantive law." *McWilliams v. McCabe*, 179 A.2d 222, 229 (Pa. 1962). As noted in WILLISTON ON CONTRACTS:

> The view that the parol evidence rule is substantive finds its most common practical application in appellate rulings to the effect that a trial court may disregard prohibited parol evidence even without an objection to its admission. The courts . . . have taken the view that, as the rule that parol testimony with respect to prior or contemporaneous agreements is not admissible to vary, contradict, or add to the terms of a written instrument is one of substantive law, and not a mere rule of evidence, testimony introduced in violation of the rule, even in the absence of objection thereto, can be given no legal effect.

11 WILLISTON ON CONTRACTS § 33:4 (4th ed. 2026) (quotation marks and footnotes omitted).

The Employment Agreement contains an integration clause and clearly "represents the whole engagement of the parties." *See Yocca*, 854 A.2d at 497. This fully integrated, unambiguous contract simply does not contain any term requiring Appellant Allegheny Clinic to supply Dr. Hammell with a sufficient number of patients or referrals that would enable Dr. Hammell to reach his wRVU target. Rather, the agreement unambiguously states that Dr.

Hammell is paid a base salary and that, if Dr. Hammell does not achieve his stated wRVU target, his base salary for the following year would be reduced by a certain percentage. *See* Base Employment Agreement 5/30/13, at 1-19; Amended Employment Agreement, 6/2/16, at 1-3. Further, Dr. Hammell does not claim that he and Appellant Allegheny Clinic omitted any term by "fraud, accident or mistake." *See Yocca*, 854 A.2d at 497. Thus, in this fully integrated contract, the unambiguous terms of the Employment Agreement "cannot be added to [or] subtracted from by parol evidence." *See id.*

In this case, the trial court relied upon the doctrine of necessary implication to supply an alleged missing term and declared that, under the contract, Appellant Allegheny Clinic was impliedly required to supply Dr. Hammell with a sufficient number of patients or referrals to allow him to reach his wRVU target. As we have explained:

> Under the doctrine of necessary implication, in the absence of an express provision, the law will apply an agreement by the parties to a contract to do and perform those things that according to reason and justice they should do in order to carry out the purpose for which the contract was made and to refrain from doing anything that would destroy or injure the other party's right to receive the fruits of the contract.
>
> A court may imply a missing term in a parties' contract only when it is necessary to prevent injustice and it is abundantly clear that the parties intended to be bound by such term. A court should only imply a term into a contract where it is clear that the parties contemplated it or that it is necessary to imply it to carry out the parties intentions.

*Glassmere Fuel Serv., Inc. v. Clear*, 900 A.2d 398, 402-403 (Pa. Super. 2006) (quotation marks, citations, and emphasis omitted).

- 15 -

Here, it is not "abundantly clear" that the parties intended to be bound by an unstated term whereby Appellant Allegheny Clinic was "responsible for referring sufficient patients to Dr. Hammell to enable him to meet the wRVU quota." ***See*** Trial Court Opinion, 8/20/25, at 9. To be sure, the agreement expressly states that, if Dr. Hammell failed to reach the specified wRVU target, Dr. Hammell's base salary for the following year would be reduced by a certain percentage. ***See*** Base Employment Agreement, 5/30/13, at 18; ***see also*** Amended Employment Agreement, 6/2/16, at 2. The mere presence of this express contractual provision indicates that the parties **anticipated** there would be years where Dr. Hammell could not achieve his base productivity target (due to lack of patients or otherwise) and that, as a result, Dr. Hammell's salary for the following year must be reduced by a certain percentage. Thus, the contract, as written, demonstrates that the parties **did not intend** to be bound by any term requiring Appellant Allegheny Clinic to be "responsible for referring sufficient patients to Dr. Hammell to enable him to meet the wRVU quota." ***See*** Trial Court Opinion, 8/20/25, at 9.

Simply put, the contractually-stated adjustment to Dr. Hammell's salary, based upon an anticipated occurrence, was bargained for between the parties and the terms of this fully integrated, unambiguous contract cannot be altered by the courts. We thus respectfully conclude the trial court erred as a matter of law when it invoked the doctrine of necessary implication to declare that, under the contract, Appellant Allegheny Clinic was impliedly

required to supply Dr. Hammell with a sufficient number of patients or referrals that would enable Dr. Hammell to reach his wRVU target.

For like reasons, we conclude the trial court erred when it found that Appellant Allegheny Clinic failed to "exercise[] good faith and fair dealing in the performance of the [Employment Agreement] with Dr. Hammell" by unreasonably exercising its discretion to not advocate for Dr. Hammell and to reduce his salary, thereby acting in contravention of Dr. Hammell's expectations. *See* Trial Court Opinion, 8/20/25, at 13-15.

We have held:

> The general duty of good faith and fair dealing in the performance of a contract as found in The Restatement (Second) of Contracts § 205, has been adopted in this Commonwealth. . . . The duty of "good faith" has been defined as "[h]onesty in fact in the conduct or transaction concerned." *See* 13 Pa.C.S.A. § 1201.
>
> The obligation to act in good faith in the performance of contractual duties varies somewhat with the context and a complete catalogue of types of bad faith is impossible, but it is possible to recognize certain strains of bad faith which include: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

*Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. 1992) (some citations omitted).

A "claim for breach of the implied covenant of good faith and fair dealing is subsumed in a breach of contract claim." *LSI Title Agency, Inc. v. Evaluation Servs., Inc.*, 951 A.2d 384, 392 (Pa. Super. 2008). Further, and

importantly, the "obligation of good faith is tied specifically to and is not separate from the duties a contract imposes on the parties." ***Murphy v. Duquesne Univ. of the Holy Ghost***, 777 A.2d 418, 434 n.11 (Pa. 2001). In other words, the implied covenant of good faith and fair dealing "attaches to existing contractual obligations; it does not add new contractual duties. In essence, the duty to act in good faith and deal fairly infuses the parties' performance of their express contractual obligations." ***Hanaway v. Parkesburg Group, LP***, 132 A.3d 461, 471-472 (Pa. Super. 2015), *reversed, in part, on other grounds by* **Hanaway v. Parkesburg Group, LP**, 168 A.3d 146 (Pa. 2017); ***see also John B. Conomos, Inc.***, 831 A.2d at 706-707 (holding: the implied duty of good faith and fair dealing "cannot trump the express provisions in the contract" and it "cannot imply a term not explicitly contemplated by the contract").

In the case at bar, the Employment Agreement does not contain any provision declaring that, in the event Dr. Hammell failed to reach his productivity target, Appellant Allegheny Clinic retained discretion as to whether it would or would not reduce his base salary by a certain percentage. Rather, the agreement expressly declares that Appellant Allegheny Clinic "**shall** pay [Dr. Hammell] the Base Salary and Incentive Compensation as set forth in Exhibit A." Base Employment Agreement, 5/30/13, at 3 (emphasis added). "Exhibit A" declares, in relevant part:

A. Compensation.

1. Base Salary:

[Dr. Hammell's] Base Salary during the Term of this Agreement is [$380,000.00]. . . . [Dr. Hammell's] Base Salary **shall** be subject to adjustment as set forth in Section A.2 . . . of Exhibit A.

. . .

2. Productivity Adjustment:

If, in any contract year during the Term, [Dr. Hammell] fails to generate . . . wRVUs greater than or equal to the wRVU Target . . . set forth in Section A.1. above, [Dr. Hammell's] Base Salary for the following contract year **shall** be determined by multiplying the Base Salary set forth in Section A.1. above by a fraction the numerator of which shall be the number of wRVUs generated by [Dr. Hammell] for the contract year then ended and the denominator of which shall be wRVU Target set forth in Section A.1. above.

Base Employment Agreement, 5/30/13, at 18, *as amended by* Amended Employment Agreement, 6/2/16, at 1-2 (emphasis added).

As is apparent from the above, the Employment Agreement simply declares that, if Dr. Hammell failed to reach his productivity target, his base salary for the following year **would be reduced** by a certain percentage. Nothing in the Employment Agreement declares that the reduction in Dr. Hammell's base salary was discretionary. As such, it was error for the trial court to infer such a term into the fully integrated, unambiguous contract between the parties and to then conclude that Appellant Allegheny Clinic breached its implied duty of good faith and fair dealing in exercising this non-existent contractual term of discretion. ***See McWilliams***, 179 A.2d at 229 (holding: "the parol evidence rule is a rule not of evidence but of

- 19 -

substantive law"); *see also John B. Conomos, Inc.*, 831 A.2d at 706-707 (holding: the implied duty of good faith and fair dealing "cannot trump the express provisions in the contract" and it "cannot imply a term not explicitly contemplated by the contract").

Appellant Allegheny Clinic also claims the trial court erred in concluding that it breached its express obligation under the Employment Agreement to provide Dr. Hammell with "personnel, facilities, equipment, services, and supplies."[7] *See* Appellant Allegheny Clinic's Brief at 17.

"[T]he interpretation of the terms of a contract is a question of law for which our standard of review is *de novo*, and our scope of review is plenary." *McMullen v. Kutz*, 985 A.2d 769, 773 (Pa. 2009). As our Supreme Court explained:

_____

[7] Appellant Allegheny Clinic asserted in its post-trial motion and concise statement that no provision of the Employment Agreement obligated it to supply patients to Dr. Hammel, the factor later cited by the trial court as the reason the doctor missed his wRVU quota. While Appellant Allegheny Clinic did not specifically refer to the express terms of the Employment Agreement, we are nonetheless reluctant to find waiver in this case, as the trial court did not explain the basis for its decision until after Appellant Allegheny Clinic filed its Rule 1925(b) statement. *See* Trial Court Opinion, 8/2025, at 1-19. Therefore, since Appellant Allegheny Clinic did not have an opportunity to raise this claim of error until it filed its brief to this Court, any failure to raise the claim in its post-trial motion and Rule 1925(b) statement would not necessitate a finding of waiver. *See Riverview Carpet & Flooring, Inc. v. Presbyterian SeniorCare*, 299 A.3d 937, 980 n.32 (Pa. Super. 2023) (holding: even though the appellant did not raise a particular claim in its Rule 1925(b) statement, the claim was not waived on appeal because "the trial court did not provide a legal basis for [its order] until its Rule 1925(a) opinion").

the parties have the right to make their own contract, and it is not the function of [a court] to re-write it, or to give it a construction in conflict with the accepted and plain meaning of the language used. It is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, without regard to its wisdom or folly.

. . .

In determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a contract do not assume that its language was chosen carelessly. Neither can it be assumed that the parties were ignorant of the meaning of the language employed.

**Steuart v. McChesney**, 444 A.2d 659, 662 (Pa. 1982) (quotation marks, citations, and corrections omitted).

Here, the parties agreed upon the following, relevant language:

Employer Responsibilities.

(a) Practice Support. [Appellant Allegheny Clinic] shall provide [Dr. Hammell] with such personnel, facilities, equipment, services, and supplies as are required by [Dr. Hammell's] practice and other duties under this Agreement consistent with general industry standards. [Appellant Allegheny Clinic] shall seek the input of [Dr. Hammell] on issues related to office personnel and staffing; provided, however, that all such decisions shall remain subject to the sole and absolute discretion of [Appellant Allegheny Clinic]. Notwithstanding the foregoing, [Appellant Allegheny Clinic] shall undertake commercially reasonable efforts to ensure that [Dr. Hammell's] practice is adequately staffed to answer telephone calls, schedule patient appointments, greet and escort patients to exam rooms, review with patients their completed medical history sheet, obtain and record patient vital signs, enter patient histories into their visit notes, ensure any prior history is entered into patient charts, communicate patient instructions to front office staff, facilitate prescribed course of treatment, assist with

- 21 -

information technology issues and assist [Dr. Hammell] with in-office medical procedures.

Base Employment Agreement, 5/30/13, at 18.

According to this "practice support" provision, Appellant Allegheny Clinic has the duty of "provid[ing Dr. Hammell] with such personnel, facilities, equipment, services, and supplies as are required by [Dr. Hammell's] practice and other duties under [the Employment Agreement] consistent with general industry standards." Employment Agreement at 4. One of Dr. Hammell's "other duties" under the Employment Agreement is that he achieve a certain number of wRVUs per year. *See id.* at 18.

Following trial, the trial court determined that Appellant Allegheny Clinic breached this contractual duty – and caused Dr. Hammell's failure to meet his wRVU quota – when Appellant Allegheny Clinic: failed to act on Dr. Hammell's "suggest[ion] of increasing [his] wRVUs by creating a wound care or hernia center at" the hospital and failed to "build[] up referring Primary Care Physicians and surgical specialists at Canonsburg Hospital," following a "talk" between Dr. Thomas Corkery and Appellant Allegheny Clinic. *See* Trial Court Opinion, 8/20/25, at 7-8. Now on appeal, Appellant Allegheny Clinic contends that the trial court erred in concluding that it breached the contractual provision because: "[i]t is clear [] under the [Employment Agreement that Appellant Allegheny Clinic] was required to provide personnel, facilities, equipment, services and supplies as are required by [Dr. Hammell's] practice – not business and patient referrals." Appellant Allegheny Clinic's Brief at 16 (emphasis omitted). Further, Appellant Allegheny Clinic argues that it could

not have breached the above provision, as the stated business proposals were mere suggestions. *See id.* at 17. Applying the principles of contract interpretation as a matter of Pennsylvania law, we agree with Appellant Allegheny Clinic's construction of the Employment Agreement.

Here, the trial court determined that the contractual phrase "personnel, facilities, equipment, services, and supplies" included an obligation on Appellant Allegheny Clinic's part to create a wound care or hernia center at the hospital and to build a network of referring primary care physicians and surgical specialists at Canonsburg Hospital. *See* Trial Court Opinion, 8/20/25, at 7-8. At the outset, we conclude that neither alleged obligation is encompassed within the plain terms of the contractual phrase "personnel, facilities, equipment, services, and supplies." Certainly, the creation of a wound care and hernia center and the building of a primary care physician network constitute costly and significant business decisions, the utility of which must be evaluated by hospital executives. In no way can such sizeable, institutional business undertakings be encompassed within Appellant Allegheny Clinic's "practice support" obligations to Dr. Hammell under the terms of an employment agreement. The trial court erred in concluding otherwise. *See Commonwealth by Shapiro v. UPMC*, 188 A.3d 1122, 1132 (Pa. 2018) ("[i]nterpreting the terms of a contract is a question of law, thus implicating a *de novo* standard of review and a plenary scope of review").

Moreover, as the trial court acknowledged, the wound care and hernia center was merely "suggested" by Dr. Hammell and the building of the primary

care physician network was simply "talked" about by Dr. Thomas Corkery. *See* Trial Court Opinion, 8/20/25, at 7-8.  Under the plain language of the contract, Appellant Allegheny Clinic's "failure to act" on mere suggestions and ideas cannot be considered a breach of its obligation to provide Dr. Hammell with the necessary "personnel, facilities, equipment, services, and supplies as are required by [Dr. Hammell's] practice and other duties under" the Employment Agreement.

Therefore, we conclude the trial court erred as a matter of law in finding that Appellant Allegheny Clinic breached its express obligation under the Employment Agreement to provide Dr. Hammell with "personnel, facilities, equipment, services, and supplies," when Appellant Allegheny Clinic:  failed to act on Dr. Hammell's "suggest[ion] of increasing [his] wRVUs by creating a wound care or hernia center at" the hospital and failed to "build[] up referring Primary Care Physicians and surgical specialists at Canonsburg Hospital." *See* Trial Court Opinion, 8/20/25, at 7-8.

In addition, since Appellant Allegheny Clinic had no contractual obligation to act on Dr. Hammell's "suggest[ion] of increasing [his] wRVUs by creating a wound care or hernia center at" the hospital or "build[] up referring Primary Care Physicians and surgical specialists at Canonsburg Hospital," we conclude that the trial court erred when it determined that Appellant Allegheny Clinic breached its implied duty of good faith and fair dealing in failing to so act. *See Hanaway*, 132 A.3d at 471-472 (holding:  the implied covenant of good faith and fair dealing "attaches to existing contractual obligations; it does

not add new contractual duties. In essence, the duty to act in good faith and deal fairly infuses the parties' performance of their express contractual obligations").

We have thus concluded that the trial court erred as a matter of law when it found in favor of Dr. Hammell and against Appellant Allegheny Clinic on the breach of contract claim. Accordingly, we also agree with Appellant Allegheny Clinic's contention that the trial court erred when it found in favor of Dr. Hammell and against Appellant Allegheny Clinic on the WPCL claim. *See Andrews v. Cross Atl. Capital Partners, Inc.*, 158 A.3d 123, 133 (Pa. Super. 2017) (*en banc*) ("[t]he underlying purpose and intent of the WPCL is to remove some of the obstacles employees face in litigation by providing them with a statutory remedy of an employer's **breach of its contractual obligation** to pay wages") (emphasis in original). In the case at bar, Appellant Allegheny Clinic paid Dr. Hammell his contractually agreed upon salary. As such, Dr. Hammell's WPCL claim fails as a matter of law.

Judgment vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  8/4/2026

- 25 -